**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

**IN RE: PAMELA SUE MONROE, Debtor**                    **No. 2:13-bk-71026**
                                                              **Chapter 7**

**PAMELA SUE MONROE**                                       **PLAINTIFF**

**v.**                          **2:14-ap-7030**

**U.S. DEPARTMENT OF EDUCATION and**
**EDUCATIONAL CREDIT MANAGEMENT CORP.**              **DEFENDANTS**

**ORDER AND OPINION**

Pamela Monroe [the debtor] filed her chapter 7 bankruptcy case on March 20, 2013.  She received her discharge on June 21, 2013, and her case was closed on July 15, 2013.  On November 8, 2013, the debtor filed a motion to reopen her case for the purpose of filing an adversary proceeding to determine the dischargeability of nine student loans incurred during two separate periods of college attendance–from 2000 to 2005 and from 2009 to 2010.  The Court granted the debtor's motion to reopen on December 4, 2013, and the debtor filed this adversary proceeding against the United States Department of Education [DOE] and Educational Credit Management Corporation [ECMC] on April 14, 2014.[1]  In her complaint, the debtor seeks a determination that seven student loans owed to DOE and two loans owed to ECMC are discharged pursuant to 11 U.S.C. § 523(a)(8).  The Court held a trial on July 21, 2015.  Forrest L. Stolzer appeared on behalf of the debtor.  Deborah J. Groom appeared for DOE and Mac D. Finlayson appeared for ECMC.  At the conclusion of the trial, the Court took the matter under advisement.  For the reasons

---

[1]  ECMC is the successor in interest to the original lender of two loans obtained by the debtor from Oklahoma Student Loan Authority.

stated below, the Court finds that two loans owed to ECMC totaling $19,487.68 and two loans owed to DOE totaling $6577.53 are non-dischargeable.  The Court further finds that five loans owed to DOE totaling $29,945.47 impose an undue hardship upon the debtor and are discharged pursuant to § 523(a)(8).

## Background[2]

The debtor, now 57 years of age and without dependents, married in 1978.  Except for brief periods of employment in retail sales positions when family finances required, the debtor stayed home with her three children until 1994, when she and her husband of 17 years divorced.  After her divorce, the debtor worked as a receptionist at JC Penney department store until she remarried in 1996.  From 1996 until the dissolution of her second marriage in 1999, the debtor did not work outside of the home.  In 2000, the debtor enrolled at the University of Arkansas at Fort Smith.  In 2005, she received a bachelor's of arts degree in rhetoric and writing, hoping to find a job as a news anchor.  After graduation, she visited several television stations in Fort Smith and made acquaintances within the industry.  Despite forging professional contacts within her desired field of employment, she was unable to secure an interview for a news anchor position.[3]  She found "little jobs here and there" and continued to search for a better job.  Her first job after receiving her degree was with a funeral home selling prearranged funerals through cold calls and visits to the families of the recently deceased.  The debtor also worked for a year in the Fort Smith public school system as a "paraprofessional" attending to children with special needs and in the emergency room at Sparks Regional Medical Center assisting uninsured patients with the Medicaid application process.

_____

[2]  Unless otherwise stated, the facts in the background section were derived from the debtor's testimony on July 21 and were not disputed by ECMC or DOE.

[3]  The debtor testified that she would have relocated for a news anchor job.  However, she was not willing to move to Little Rock and she confined her search for a news anchor position to Fort Smith.

2

In 2009, the debtor returned to the University of Arkansas–this time in Fayetteville–to pursue a graduate degree in speech pathology.  The debtor completed 18 hours of course work but left the program on October 1, 2010, prior to attaining a graduate degree.  To finance her undergraduate and graduate studies, the debtor obtained multiple student loans and, as a result, is indebted to ECMC for two consolidation loans and to DOE for seven loans, as described below.  The debtor stipulates that she has made no payments on the nine loans.

The first ECMC loan for $15,125.00 was disbursed on July 15, 2005, at an interest rate of $2.8755\%$; the second ECMC loan for $2799.00 was disbursed on September 22, 2006, at an interest rate of $5.37\%$.  The debtor and ECMC stipulate that as of July 5, 2015, the debtor owed to ECMC a total of $19,487.68, with interest accruing at a rate of $1.66 per diem.  The monthly payment on the ECMC debt is $107.00.[4]  The debtor and DOE stipulate that as of the July 21 trial date, the seven loans to DOE total $36,523.00.  The origination date, amount, and monthly payment on each of the DOE loans are as follows:

- September 8, 2008:   $1872.02, 6% interest, monthly payment of $20.93;
- January 12, 2009:   $1024.11, 6% interest, monthly payment of $11.73;
- January 12, 2009:   $9352.14, 6% interest, monthly payment of $111.04;
- August 13, 2009:   $2870.17, 5.6% interest, monthly payment of $50.00;
- August 13, 2009:   $11,764.71, $6.8\%$ interest, monthly payment of $139.69;
- April 10, 2010:   $577.60, 6.8% interest, monthly payment of $6.86;

---

[4] At the July 21 trial, debtor's counsel identified Plaintiff's Exhibit 6 as a two-page document "showing some information on the loans held by ECMC."  The second page of Plaintiff's Exhibit 6 reflects details of the two ECMC loans but contains no monthly payment amount for either loan.  The first page of Plaintiff's Exhibit 6 reflects a monthly payment amount of $107.00.  Despite appearing to reference only the ECMC loan disbursed on July 15, 2005, the debtor testified–and ECMC did not dispute–that the $107.00 payment reflected on the first page of Plaintiff's Exhibit 6 is a consolidated payment for both ECMC loans.

•       August 13, 2010:     $4768.21, 6% interest, monthly payment of $56.62.[5]

The debtor's monthly payments on the seven DOE loans total $396.87. Combined with the ECMC payment of $107.00, the debtor's aggregate monthly student loan obligation is $503.87.

After leaving graduate school in 2010, the debtor applied for what she estimates as hundreds of jobs by sending out resumes and submitting applications online through websites such as Monster.com and Careerbuilder.com. She initially focused on finding and applying for pharmaceutical sales jobs because the positions pay well and her four-year college degree satisfied the educational prerequisites. She interviewed with an estimated twenty potential employers in diverse fields–including four pharmaceutical companies, a transportation company, and the Girl Scouts of America–but none of the interviews came to fruition in the form of a higher-paying job offer. The debtor believes that her age played a role in the unsuccessful outcome of her job search, citing one instance in which an interviewer mentioned his own age repeatedly in what she felt was an attempt to coerce her into disclosing the same information. The debtor obtained an insurance license in 2011 and found a job in Fort Smith selling insurance for $10.00 per hour plus commission. The job required her to use her own vehicle and pay for her own gasoline to make cold calls on potential customers. She became disheartened with the insurance position when she reached the conclusion that commissions were unattainable. She left the insurance position to work at a temp agency until she found a part-time job at Victoria's Secret. She worked sporadically at Victoria's Secret for three years but

---

[5] The amount of the DOE loans are stated as of the origination date of each loan pursuant to the parties' stipulation. At trial, the DOE introduced two certificates of indebtedness reflecting the updated balances of each loan as of July 13, 2015, as follows: September 8, 2008 loan, $2050.25; January 12, 2009 loan, $1149.24; second January 12, 2009 loan, $10,646.79; August 13, 2009 loan, $3197.53; second August 13, 2009 loan, $13,393.34; April 10, 2010 loan, $657.56; and August 13, 2010 loan, $5428.29. Plaintiff's Exhibit 5 furnished the monthly payment amount for each loan as of September 7, 2013.

because the job entailed no more than 24 hours per week, the debtor left that position permanently in January 2013 to work for an attorney in Fort Smith as a paralegal.[6]  On March 20, 2013, the debtor filed her chapter 7 bankruptcy case, scheduling her nine student loans totaling $48,881.00 as unsecured debt and listing only one other debt–a credit card with a balance of $8822.00.  The debtor's student loans comprised 85% of the debt listed in her schedules.  The debtor received her discharge–exclusive of her student loan debt–on June 21, 2013.

The debtor continued to work as a paralegal for two years, but after her repeated requests for a raise were denied, she left that position in February 2015 to take a job as a cosmetics sales representative at Dillard's department store in Rogers.[7]  To be closer to work, the debtor used her 2014 tax refund[8] and money borrowed from her mother to move from Fort Smith to Rogers in March 2015, renting an apartment located four miles from Dillard's.  She currently makes $13.00 per hour plus commission and is guaranteed a minimum of 37 hours per week.  If she remains in her present position, she expects to make $26,000.00 to $27,000.00 in 2015–her highest annual income to date.[9]  At trial, the debtor introduced into evidence her amended Schedules I and J, stating her estimated average or projected monthly income and expenses, respectively.  Schedule I reflects that the debtor's current gross income per month is $2275.00 with deductions of $452.00 for

---

[6]  The debtor testified that she was unemployed for four months in 2012 while she unsuccessfully sought disability benefits for "bilateral rotator cuff syndrome."

[7]  The debtor acknowledges that she has held a number of jobs since obtaining her undergraduate degree.  She testified that she voluntarily left each job in search of "the next best thing" in the form of a  position that would allow her to make more money.

[8]  During the past five years, the debtor has consistently received tax refunds ranging from $575.00 to $1074.00 and testified that she expects to receive a refund for the current year.  The debtor admits that she has never used any part of her yearly tax refund to make payments on her student loan debt.

[9]  The debtor's tax returns reflect that she made $10,664.00 in 2010; $14,779.00 in 2011; $11,317.00 in 2012; $20,060.00 in 2013; and $20,800.00 in 2014.

taxes and $68.00 for 401(k) contributions leaving her with a net monthly income of
$1755.00.  Her most recent Schedule J itemizes her monthly expenses of $1932.50 as
follows:

| | |
|---|---|
| Rent | $535.00 |
| Electricity | $55.00 |
| Water/Sewer | $25.00 |
| Home repairs | $5.00 |
| Food | $400.00 |
| Clothing | $50.00 |
| Laundry/Dry Cleaning | $20.00 |
| Medical/Dental Expenses | $25.00 |
| Transportation | $400.00 |
| Recreation | $25.00 |
| Life Insurance | $6.00 |
| Health Insurance | $107.00 |
| Auto Insurance | $49.00 |
| Personal Property Tax | $4.00 |
| Personal Care | $60.00 |
| Cleaning Supplies | $35.00 |
| Cell Phone | $88.00 |
| Internet | $30.00 |
| Lifelock | $13.50 |

At trial, the debtor expounded upon several of the expenses categorized in Schedule J.
She testified that her medical expenses include visits to a podiatrist for plantar faciitis.
Additionally, she clarified that the $400.00 monthly expense for transportation includes
oil changes, upcoming repairs to the Camry, and gasoline.  She testified that she drives to
Fort Smith to see her mother once per month and on cross-examination agreed that her
total gasoline purchases are minimal due to living four miles from work.  She also agreed
that oil changes are not a monthly expense.  The remainder of the $400.00 monthly
transportation expense is designated for repairs that need to be made to the Camry.  Since
filing her chapter 7 case in 2013, the debtor believes that the Camry's value has
decreased from $6500.00 to $3000.00.  She attributes the Camry's depreciation to
increased mileage, an oil leak, an unreliable starter, a hose near her air filter that needs to
be replaced, a faulty sensor that causes her "check engine" light to illuminate, a minor
accident that occurred three days before she moved to Rogers and resulted in $1639.43

6

worth of body damage, and scratches from a tree that fell on the Camry after she moved to Rogers that she believes would cost roughly $150.00 to "buff out." At trial, the debtor introduced an estimate from Auto Appearance Group stating that the Camry needs $1639.43 worth of body work, and she estimates that it will cost $3000.00 to make all necessary repairs to the Camry. To date, the debtor has made none of the repairs.[10]

On Schedule J, the debtor estimates that she spends $400.00 on food and $25.00 on recreation each month. At trial, these two categories were often discussed together because the debtor testified that her only form of recreation (other than internet service, which she uses for recreation as well as for applying for jobs) is going to restaurants with co-workers. The debtor's bank statements reflect that she spends an average of $534.00 per month at various wholesale, grocery, and health food stores [referenced together as grocery stores]. In addition, for the 18-month period prior to trial, the debtor spent, on average, an additional of $180.00 per month at restaurants. Since the debtor's move to Rogers in March 2015, her monthly restaurant expenditures have increased, now averaging $214.00.[11] The debtor eats out almost every day–usually more than once and regularly at mid-priced and upscale restaurants. For example, on April 13, the debtor ate out four times, spending $6.10 at Taco Bell, $34.75 at Bonefish, $6.68 at Starbucks, and $23.79 at JJ's Grille. On May 4, the debtor ate out four times, spending $5.02 at Taco Bell, $31.23 at Twin Peaks, $6.67 at Firehouse Subs, and $30.38 at Ruth's Chris Steakhouse. On June 8, the debtor ate out three times, spending $5.02 at Taco Bell, $27.07 at Copeland's of New Orleans, and $16.76 at Mimi's Café. On June 29, the debtor ate out five times, spending $6.51 at Savoy Tea Company for coffee, $11.16 at Uncle Maddio's Pizza, $7.00 at Firehouse Subs, $12.94 at Mimi's Café, and $12.72 at

---

[10]   Despite having made none of the repairs, on May 20, 2015, the debtor spent $76.00 on floor mats that she ordered from the Toyota dealership.

[11]   The debtor's average monthly restaurant expense since moving to Rogers in March is likely higher than the $214.00 calculated by the Court because the July bank statement introduced at trial was a partial statement running through July 13.

The Olive Garden.  The most recent complete bank statement shows that the debtor spent $296.60 on restaurant meals from May 21, 2015, to June 22, 2015–the debtor's highest restaurant expenditure in any month represented by the 18 bank statements before the Court.  She testified that some of her meals include appetizers and alcohol–despite developing an intolerance to liquor in recent years.

DOE argues that in the light of her student loan debt, the debtor's expenses related to eating out are excessive and suggested to the debtor at trial that she could dedicate $20.00 to $30.00 per month toward paying down her student loan debt if she eliminated just one of the several meals per month that she enjoys at nice restaurants.  The debtor discounted the DOE's proposition by denying that she eats out at a nice restaurant more than once per month on a regular basis.[12]   In addition to the debtor's testimony that she eats out for recreation, she named her work hours of 12:00 p.m. to 9:00 p.m. as an additional catalyst for her frequent meals out.  When asked on cross-examination whether she could take her lunch to work, she said there was "nowhere to put it."  Upon further questioning, she admitted that Dillard's does provide a break room with a refrigerator but said that she does not want to use it because "people steal the lunches" from the break area.  Despite citing her current work hours as the reason for eating out so often, the debtor provided no justification for similar restaurant expenditures made in Fort Smith when she was working from 9:00 a.m. to 5:00 p.m. as a paralegal–other than to say that some of the expenses were related to eating at restaurants, bars, and casinos with a country-western dance group to which she belonged when she lived in Fort Smith.[13]

---

[12]  When counsel for DOE asked the debtor to explain how she could maintain that she eats out at nice restaurants only once per month despite bank records showing that the debtor purchased four meals at The Olive Garden alone in a two-week period, the debtor responded by saying that she does not consider The Olive Garden to be a "nice" restaurant.

[13]  She testified that she stopped participating in the dance group because she moved to Rogers.

The debtor contends that her current income does not afford her the ability to repay her student loans after deducting her necessary expenses.  Her recently filed Schedules I and J reflect a monthly deficit of $177.50 without taking into account the monthly student loan payments that are currently either deferred or in forbearance.  The debtor believes that her age dissuaded potential employers from hiring her in the past and believes that it would be a similar hindrance to securing a higher-paying job in the future.   While the debtor contends that her income has permanently plateaued, she predicts that her expenses have not.  Specifically, she believes that she needs to make $3000.00 worth of repairs to her 1999 Toyota Camry.  Additionally, the debtor contends that she should not be forced to curtail her restaurant outings to repay her student loans because eating out is her only form of social interaction.  She equates the prospect of having to reduce or eliminate her dining excursions in the name of repaying her student loans to a "self-imposed debtors' prison."  In sum, the debtor's position is that she cannot maintain a minimal standard of living while also repaying her student loans based on her current income and expenses, static earning potential, and expected future vehicle expenses.  Therefore, the debtor believes that her student loans impose an undue hardship and should be discharged.  In response, DOE argues that the debtor could reduce her spending by eating out less frequently in order to afford payments on her student loans.  ECMC urges the Court not to consider the debtor's age in its undue hardship analysis because educational lenders may not take into a account a borrower's age when evaluating student loan applications.

The debtor stipulates that she qualifies for two federal student loan repayment programs for which she has not applied–the Income Contingent Repayment Program [ICRP] and the Income Based Repayment Program [IBR].  Both programs use a debtor's income level to calculate the amount of the debtor's monthly student loan payment.  Each year, a participating debtor's income is reevaluated and if the debtor's financial circumstances have changed, the monthly payment is adjusted for the following year.  The IBR lasts for a maximum of 25 years, at which time any outstanding balance is forgiven.  *See e.g., Williams v. Educ. Credit Mgt. Corp.* (*In re Williams*), 492 BR. 79, 82 (Bank. M.D. Ga.

2013).  DOE, ECMC, and the debtor stipulate that the debtor's current monthly payment under the IBR would be zero.  The debtor admitted on cross-examination that a monthly payment of zero under the IBR would have no impact on her monthly finances.

### Findings of Fact and Conclusions of Law

Section 523(a)(8) provides that student loans are not discharged in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  To obtain a discharge of student loan debt, a debtor must prove by a preponderance of the evidence that repayment constitutes an undue hardship. *Parker v. Gen. Revenue Corp.* (*In re Parker*), 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005). Proving undue hardship requires more than a demonstration that it would be difficult for the debtor to repay the student loans.  *Id.* at 553.  The Eighth Circuit characterizes the debtor's burden under § 523(a)(8) as "rigorous."  *Educ. Credit Mgmt. Corp. v. Jesperson* (*In re Jesperson*), 571 F.3d 775, 779 (8th Cir. 2009).

Because § 523(a)(8) does not define undue hardship, "courts have devised their own methods of determining whether an undue hardship exists."  *Conway v. Nat'l Collegiate Trust* (*In re Conway*), 495 B.R. 416, 419 (B.A.P. 8th Cir. 2013).  The Eighth Circuit employs a totality of the circumstances test that requires courts to evaluate the debtor's "past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and 'any other relevant facts and circumstances.'"  *In re Jesperson,* 571 F.3d at 779 (quoting *Long v. Educ. Credit Mgmt. Corp.* (*In re Long*), 322 F.3d 549, 554 (8th Cir. 2003)) . "[I]f the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt–while still allowing for a minimal standard of living–then the debt should not be discharged."  *In re Long*, 322 F.3d at 554-55.  Generally, a minimal standard of living includes "the ability to pay for food, shelter, utilities, personal hygiene, clothing, medical and dental expenses, and recreation."  *Johnson v. Sallie Mae, Inc.* (*In re Johnson*), No. 5:13-ap-7010, 5:13-ap-7011, 2014 WL 7011097, at *3 (Bankr. W.D. Ark. Apr. 30, 2014) (citing *Shadwick v. U.S. Dept. of Educ. et al.* (*In re Shadwick*), 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006)).

Accordingly, the Court will evaluate the totality of the circumstances to determine whether the debtor has the financial resources to maintain a minimal standard of living while also paying her student loan debts.

## I.      Past, Present, and Future Financial Resources

Since receiving her undergraduate degree in 2005, the debtor's employment history has been diverse.  She has worked in various retail settings, insurance sales, funeral service sales, as a paralegal, in an emergency room, and in the public school system.  She voluntarily left each position in search of something better upon reaching what she believed to be the compensatory ceiling of each job.  Apparently, the debtor's strategy of changing jobs in quick succession worked to some extent–her tax returns for the past five years and her pay stubs from Dillard's indicate that–despite an aberrant four-month period of unemployment in 2012–the debtor's income has generally been on an upward trajectory since 2010.  In fact, the debtor is now earning more than twice what she earned in 2010.

Although the debtor testified that she applied for disability benefits relating to "bilateral rotator cuff syndrome" in 2012, there is no evidence before the Court that the syndrome persists today or that it currently affects her ability to work.  The debtor also sees a podiatrist for plantar faciitis but, again, there is no evidence that this condition affects her ability to work at Dillard's–a job that, presumably, requires the debtor to stand for extended periods of time.  Further, the debtor's participation in a dance group as recently as four months before trial indicates that the debtor's foot issues have not historically interfered with her ability to ambulate, particularly when combined with the debtor's testimony that she stopped participating in the dance group because she moved to Rogers–making no mention of foot problems as a contributing factor.  Although the debtor takes ibuprofen sporadically for knee and leg pain, sees a podiatrist, and experienced rotator cuff problems three years ago, the Court finds that the debtor's physical condition does not constitute a disability or even an impediment to her

11

continued employment.[14]

Further, the Court finds that the instability in the debtor's work history arises not from the debtor being an unsatisfactory employee but merely from the debtor's desire to move on from each position in favor of something better.  As for the security of her current job, the debtor testified that Dillard's is always looking for employees and–to the extent that the concept of job security applies to employees in an at-will state such as Arkansas–the Court finds that, absent the debtor voluntarily ending her tenure at Dillard's, it is reasonably certain that she will maintain her present level of income for the foreseeable future.  As a result, the Court will evaluate the debtor's ability to pay her student loans while maintaining a minimal standard of living based upon her current income as reflected in amended Schedule I.

## II.      Reasonable and Necessary Living Expenses

In order for expenses to be reasonable and necessary in the context of a § 523(a)(8) analysis, they must be "modest and commensurate with the debtor's resources."  *In re Jesperson*, 571 F.3d at 780 (citation omitted).  "While the total amount of monthly expenses must be reasonable, courts also scrutinize specific expenses to determine whether those expenses are unnecessary and excessive to the extent that funds can be reallocated to pay for the student loans the debtor seeks to discharge."  *In re Johnson*, 2014 WL 7011097, at *4.  After reviewing the debtor's expenses as represented in both her original and amended Schedule J and supplemented by her bank statements, the Court finds that the debtor's expenses for rent, utilities, medical and dental care, insurance, and internet service are reasonable.  However, the Court finds that several of the debtor's expenses are unnecessary or excessive.  As a result, the Court has adjusted the expenses in the debtor's amended Schedule J–which currently states a monthly deficit of

---

[14]  The debtor's bank statements support her testimony that she sees a podiatrist and other medical service providers on occasion, but no medical testimony or records were introduced at trial elucidating the nature or severity of the issues for which she currently seeks care.

$177.50–for the reasons and in the amounts discussed below.

### A.    Lifelock

The debtor pays $13.50 per month for Lifelock, a credit and identity-theft protection service.  The debtor offered no explanation at trial as to why she believes that this monthly expense is necessary and the Court finds that it is not.  Therefore, the Court adds $13.50 to the debtor's budget, reducing her monthly shortfall of $177.50 to $164.00.

### B.    Transportation

When the debtor filed bankruptcy in 2013, she drove the same vehicle that she continues to drive currently–a 1999 Toyota Camry [the Camry].  In 2013, she stated in her original Schedule J that her transportation expenses were $250.00 per month.  In her amended Schedule J, she listed her transportation expenses at $400.00 per month.  She testified that this estimate includes gasoline, oil changes, and repairs that need to be done to the Camry.  However, as stated above in the background section, the debtor admits that her gasoline expenditures are minimal–she lives only four miles from work and makes the trip to see her mother in Fort Smith one time per month.  Based upon the Court's review of her gasoline purchases as reflected in her bank statements, the Court finds that since her move to Rogers, the debtor spends approximately $30.00 per month on gasoline.  Accordingly, the Court sets the debtor's monthly gasoline budget at $50.00.[15]  The Court further allows an additional $35.00 per month for oil changes and other regular maintenance.

---

[15]  The Court takes judicial notice that gasoline prices in Arkansas currently average $2.013 per gallon–making the Court's allowance of a $50.00 gasoline budget arguably too generous in relation to the number of miles that the debtor drives per month. However, in setting the debtor's budget at $50.00, the Court acknowledges the reality that gasoline prices are subject to sometimes drastic fluctuations, noting that just one year ago, gasoline cost $3.017 per gallon.

The Court next turns to the future repairs to the Camry that comprise the largest component of the debtor's transportation budget. The debtor estimates that it will cost $3000.00 to rectify the Camry's body damage and mechanical issues. The estimate from Auto Appearance Group states that the Camry needs $1639.43 worth of body work; however, after reviewing the estimate, the Court concludes that it represents the cost of making repairs that would improve–as the name of the body shop suggests–only the appearance of the Camry. As a result, the Court finds that the repairs in the estimate are not necessary and deducts $1639.43 from the debtor's total repair estimation of $3000.00, leaving $1360.47 for mechanical repairs. Without more evidence, the Court cannot determine the urgency of the mechanical repairs to the Camry. Therefore, the Court budgets the mechanical repairs as a monthly expense of $113.37, which will allow the debtor to make all of the necessary mechanical repairs to the Camry over the next twelve months. Based upon the Court's review of the debtor's actual gasoline expenditures and the disallowance of strictly cosmetic repairs to the Camry, the Court adjusts the debtor's transportation budget from $400.00 to $200.00 per month. This adjustment eliminates the deficit in the debtor's monthly budget, providing her with a $36.00 monthly surplus.

### C.    Cellular Telephone

The debtor's original Schedule J filed in 2013 estimated her monthly cell phone bill at $48.00. Her amended Schedule J allocates $88.00 for her monthly cell phone bill. The debtor offered no justification for a $40.00 increase in this category and, in any event, the Court finds that $88.00 per month for cell service is excessive and reduces the debtor's monthly cell phone budget to $50.00. As a result of this adjustment, the debtor's monthly surplus is increased by an additional $38.00, bringing it to $74.00.

### D.    Food

In her original Schedule J filed two years ago, the debtor listed her monthly food expense as $250.00, while her amended Schedule J estimates her current monthly food budget at $400.00. Because personal care items, cleaning supplies, and home repair items are undoubtedly encompassed in the debtor's purchases from various grocery stores, the

14

Court included the debtor's budgeted amounts in these categories–$60.00 for personal care items, $35.00 for cleaning supplies, and $5.00 for home repair items–when comparing the debtor's budget in amended Schedule J with her actual expenses in these categories as shown in her bank statements.  When her $400.00 food budget is combined with $100.00 for personal care, cleaning supplies, and home repair purchases, her projected expenses in these categories total $500.00.  Her bank statements indicate that she spends an average of $548.00 per month at grocery stores–exceeding her projected budget by $48.00.  The Court finds that the debtor's budgeted expenses for personal care, cleaning supplies, and home repairs are appropriate, and the Court leaves intact the debtor's allocations in those categories.  However, the Court finds that the debtor's food expenditures are excessive for one person with no dependents and therefore reduces her food budget for groceries from $400.00 per month to $250.00–returning the debtor to the food budget that she established for herself two years ago.

The most concerning facet of the debtor's monthly food expense is not her excessive grocery bill; rather it is the additional $214.00 per month that the debtor currently spends at restaurants ranging from fast food to fine dining.  Depending on whether the debtor was being questioned by opposing counsel or her own attorney during the trial, she alternated between refusing to acknowledge the extent of her restaurant expenditures and attempting to justify her predilection for eating out by framing each meal as either a necessity due to her work hours at Dillard's or as a source of recreation that she believes should remain unfettered.  The Court will address the debtor's restaurant expenses for work and recreation separately below.

Regardless of the debtor's vacillation between denying and rationalizing her restaurant expenditures, bank statements do not equivocate and the debtor's reflect that she eats out on most days, sometimes buying three, four, or even five restaurant meals in a single day. Notably, her restaurant expenditures peaked in the month before trial at almost $300.00–indicating to the Court that when her income increased after moving to Rogers, so did her unnecessary spending.  When DOE's attorney questioned the debtor about a

15

string of meals eaten at The Olive Garden over a particular two-week period, the debtor testified that she likes to have a healthy meal during her lunch break at Dillard's and believes that it is not a viable option for her to bring lunch to work because of the risk that someone will take it from the break room.  If the debtor had to choose between eating at The Olive Garden (or a restaurant of similar ilk) and not eating at all, the debtor's choice to eat at The Olive Garden could be elevated to a necessary expenditure. However, the debtor is not confined to those two options.  She could choose less expensive restaurants for her work lunches or, because she lives only four miles from Dillard's, she could go home for lunch.  Common sense dictates that in the time that it takes for the debtor to be seated, order, eat, and settle her tab at The Olive Garden or another restaurant, she could navigate the brief trip to her apartment and eat a less expensive meal before returning to work.  As the Court stated in a prior student loan case, the Court  "acknowledges that the ability to seek quick, convenient lunches during the work week is often necessary for a person working outside the home." *In re Johnson*, 2014 WL 7011097, at *5.  However, the Court finds in this case–as it did in *In re Johnson*–that the debtor's currently monthly outlay for restaurant meals is excessive in the context of a § 523(a)(8) analysis.  *See id.* (citing *Gibson v. ECMC & College Assist (In re Gibson)* 428 B.R. 385, 390 (Bankr. W.D. Mich. 2010); *Southard v. Educ. Credit Mgmt. Corp.* (*In re Southard*), 337 B.R. 416, 420-21 (Bankr. M.D. Fla. 2006)).  The Court finds that $50.00 is a sufficient monthly budget for those occasions when the debtor must seek a work day lunch from a restaurant.  Accordingly, the Court adds $50.00 to the debtor's $250.00 grocery budget, bringing her total food budget to $300.00. The reduction of the debtor's monthly food budget from $400.00 to $300.00 adds an additional $100.00 to the debtor's surplus of $74.00, leaving her with an extra $174.00 per month based upon the totality of the Court's adjustments.

In addition to testifying that she is forced to eat out because of her work hours, the debtor also couched her restaurant excursions in terms of recreation, budgeting $25.00 per month in this category.  At trial, the debtor refused to admit that she eats out recreationally more than once per month, conceding only that she exceeds her budget of

$25.00 to the extent that "with tip, it might be $30.00."  Because the debtor's bank statements plainly divulged the frequency and cost of the debtor's meals at Ruth's Chris, Bonefish, and similarly upscale restaurants, the Court found the debtor's adamant denials on this point to be puzzling, at best.  Nevertheless, because a minimal standard of living includes recreation, the Court leaves undisturbed the debtor's allocation of $25.00 per month for recreational meals–noting that, in reality, the debtor will be compelled by the Court's adjustments to other areas of her budget to curb her penchant for routinely indulging in expensive meals.[16]

### III.    Other Facts and Circumstances

In undertaking an undue hardship analysis, courts in the Eighth Circuit must consider all relevant facts and circumstances in addition to reviewing the debtor's current and future financial resources and expenses.  *In re Jesperson*, 571 F.3d at 784.  Additional circumstances considered in the determination of undue hardship include, but are not limited to:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

*Id.*  (quoting *McLaughlin v. U.S. Funds* (*In re McLaughlin*), 359 B.R. 746, 750 (Bankr. W.D. Mo. 2007)).  The Court will briefly address the additional factors that it finds

---

[16]  The debtor's bank statements indicate that she was actually using most of her $400.00 "transportation" budget to fund additional restaurant expenditures rather than make repairs to the Camry.  As a result, the Court's reduction of the debtor's transportation budget from $400.00 to $200.00 provides for the cost of necessary mechanical repairs to the Camry but effectively limits the debtor's budget for extraneous restaurant expenditures.

applicable in this case.

As discussed in section I., above, the Court finds that the debtor is not physically disabled and it is apparent that she suffers no mental disability. As for the debtor's ability to find a job in her field of study, the Court concludes that she has found several. The debtor obtained a degree in rhetoric and writing, which she testified is tantamount to a communications degree. Although she hoped to use her communications degree to find a job as a news anchor, she admittedly looked no further than Fort Smith for employment in that field, despite a subjective willingness to relocate. Expanding the geographic parameters of her job inquiries might have resulted in the debtor attaining a job in the field to which she aspired. In any event, a communications degree does not naturally channel recipients into a certain career path; rather, it lends itself to employment in any number of fields–including sales. Therefore, the Court concludes that the debtor has successfully found employment in her field of study.

Further, the Court finds it troubling that the debtor has never made a single payment on any of her nine student loans, even when her yearly tax refunds afforded her the intermittent ability to do so without interfering with her normal spending habits. Also, discussed in detail earlier in this opinion, the debtor has failed to minimize her expenses by subscribing to Lifelock, increasing her monthly outlay for cell phone service, failing to go home for lunch despite the proximity between her job and her apartment, and eating out often and expensively, at times increasing her tab with appetizers and alcohol–despite a professed intolerance to liquor–and regularly buying coffees during her work day that cost half of her hourly wage at Dillard's. Next, although the debtor testified that discharging her student loans was not the primary reason for her bankruptcy, it is indisputable that her student loan debts comprised over 85% of the total debt included in her chapter 7 bankruptcy. Further, the Court finds that the debtor's age is not a compelling factor in this particular case–she is generally healthy and suffers no age-related illnesses that affect her ability to work. *See Educ. Credit Mgmt. Corp. v. DeGroot*, 339 B.R. 201, 212 (D. Or. 2006). "[T]he general consensus appears to be that

18

where debtors choose to incur educational debt later in life, the fact that they will reach retirement age during the loan repaying period is not alone enough to justify discharge under § 523(a)(8)." *Id.* Although a debtor's age is an appropriate consideration, "choosing to incur debt in pursuit of education later in life is a decision within the debtor's control, and simply because things do not work out as the debtor hoped does not make age alone a sufficient reason to discharge student loans." *Id.* at 213. "[I]f the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow." *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 780 (7th Cir. 2002).

Finally, the debtor stipulated that she qualifies for two income-based repayment programs–ICRP and IBR. A debtor's ability to participate in an income-based repayment program is a factor to be considered in an undue hardship analysis. *Lee v. Regions Bank Student Loans* (*In re Lee*), 352 B.R. 91, 95 (B.A.P. 8th Cir. 2006). She further stipulated that her payment would be zero under IBR, weighing in favor of non-dischargeability of the loans. However, the availability of income-based repayment options should not be misinterpreted to automatically foreclose the avenue provided by Congress in § 523(a)(8) for obtaining the discharge of student loan debts. *Id.* at 96. Therefore, although the debtor qualifies for both ICRP and IBR, the Court is not relieved of its duty to determine whether the debtor's student loans impose an undue hardship. *See Limkemann v. U.S. Dept. of Educ.* (*In re Limkemann*), 314 B.R. 190, 195 (Bankr. N.D. Iowa 2004).

## Conclusion

The Court's adjustments added $351.50 to the debtor's monthly budget, changing her stated deficit of $177.50 per month to a surplus of approximately $174.00 per month. However, the debtor's adjusted budget still falls short of the $503.87 needed to satisfy her monthly obligations on all nine student loans–the two ECMC loans now combined into a single payment and the seven DOE loans. Because the debtor has multiple student loans, the Court must separately determine the dischargeability of each loan. *In re Conway*, 495 B.R. at 423 (citation omitted). Generally, courts determine undue hardship

for each loan in the order that the loans were made. *See e.g., Hinkle v. Wheaton Coll.* (*In re Hinkle*), 200 B.R. 690, 691 (Bankr. W.D. Wash. 1996). However, courts are not strictly confined to evaluating the loans in chronological order if a different method is warranted under the circumstances. *Grigas v. Sallie Mae Serv. Corp.* (*In re Grigas*), 252 B.R. 866, 876 (Bankr. D. N. H. 2000) (method for selecting loans should be objectively neutral and maximize repayment). In this case, the Court finds that it is appropriate to determine the dischargeability of the debtor's student loans out of chronological order for the purpose of allowing the debtor to repay the most debt without imposing an undue hardship.

Based upon the totality of the circumstances as discussed above, the Court finds that the two loans owed to ECMC in the total amount of $19,487.68 with a combined estimated monthly payment of $107.00 are non-dischargeable. The Court further finds that the DOE loan originating on January 12, 2009, with an estimated balance of $1149.24 and monthly payment of $11.73 and the DOE loan originating on August 13, 2010, with an estimated balance of $5428.29 and monthly payment of $56.62 are, likewise, non-dischargeable.[17]

The Court concludes, however, that it would impose an undue hardship upon the debtor to repay the five remaining loans and, therefore, finds that the following DOE loans are discharged: the September 8, 2008 loan with a balance of $2050.25; the second January 12, 2009 loan with a balance of $10,646.79; the August 13, 2009 loan with a balance of $3197.53; the second August 13, 2009 loan with a balance of $13,393.34; and the April

---

[17] The payments on the non-dischargeable loans total $175.35 per month rather than $174.00. However, the Court finds that it is not an undue hardship for the debtor to locate an additional $1.35 per month–equating to less than 5 cents per day–in her budget, particularly in the light of the fact that the Court allocated slightly more money than the debtor currently needs in certain areas of her adjusted budget. In addition, to the extent that the estimated monthly payments stated in Plaintiff's Exhibits 5 and 6 have changed since the exhibits were obtained by the debtor, the Court finds that the debtor's annual tax refunds are sufficient to offset the difference.

10, 2010 loan with a balance of $657.56.  The Court will enter a separate judgment in accordance with this order.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   09/22/2015

cc:        Forrest L. Stolzer, attorney for the debtor
           Deborah J. Groom, attorney for DOE
           Mac D. Finlayson, attorney for ECMC
           R. Ray Fulmer, II, chapter 7 trustee
           United States Trustee